IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NOASHA LLC                                          :               CIVIL ACTION
                                                    :
        v.                                          :
                                                    :
NORDIC GROUP OF COMPANIES, LTD.,                    :               NO. 08-5635
FLAMBEAU, INC., DUNCAN TOYS CO.                     :

O'NEILL, J.                                                         JUNE 18, 2009

## MEMORANDUM

On December 4, 2008, plaintiff Noasha LLC filed a complaint alleging that defendants

Nordic Group of Companies, Ltd., Flambeau, Inc. and Duncan Toys Co. engaged in trademark

infringement under the Lanham Act, 15 U.S.C. § 1125, and also asserting state law claims for

unfair competition and unfair and deceptive practices.  Defendants filed an answer and

counterclaims for trademark infringement pursuant to the Lanham Act, common law unfair

competition, state law unfair and deceptive practices under 73 Pa. C.S.A. § 201-3, state law

injury to business or reputation under 54 Pa. C.S.A. § 1124 and requested a declaratory judgment

of non-infringement.  As defendants filed a notice of withdrawl of their counterclaims on June 8,

2009, I denied plaintiff's motion to dismiss these counterclaims as moot.  Presently before me are

plaintiff's motion for a preliminary injunction, defendants' response, plaintiff's reply and

defendants' amended sur-reply thereto.  A hearing on plaintiff's motion for a preliminary

injunction took place on May 19-20, 2009 with oral argument on May 27, 2009.

## BACKGROUND

Defendants assert that the Warball game was created by Patricia Bell in 2001 and that she

began selling it online in 2002 via www.warball.com to customers in the United States and

Canada, with the first sale in the United States on May 8, 2002.  Sales continued over the website

for eleven months.  An April 14, 2002 article in The Province reported that Bell had sold about

1,000 Warball games and that large toy companies were considering distribution.  Bell decided to

go into mass production and was referred to Richard Levy.  He contacted several toy companies

between 2002 and 2004, including Hasbro, Pressman Toys, USAopoly, Candaco Games and

SpinMaster Toys.  The game was initially licensed to SpinMaster on or about August 27, 2002

but SpinMaster was unable to execute the project for "technical" reasons and it returned the

rights to Bell and Levy.

Defendants allege that, at Levy's request, Bell sent the Warball game to Duncan on

September 6, 2005.  A licensing agreement became effective in April 2006 for Duncan Toys to

produce and market the Warball game.  On September 12, 2006, a competitive analysis for

Warball was completed and it was suggested that Duncan revise the game and market it as a

trading card game rather than as a marble game.

On January 23, 2007, Duncan conducted a United States Patent and Trademark Office

(USPTO) search for the term "Warball."  On January 24, 2007, Duncan registered the website

www.warballs.com to promote the re-launch of the Warball game.  Defendants allege that

bloggers began discussing the Warball game on the Duncan website www.yoyoing.com forum as

early as January 27, 2007.  Duncan registered the www.warballthegame.com website on March

11, 2008 and published the first Duncan press release on the Warball game on April 17, 2008

announcing a Spring 2009 launch that was later changed to Summer 2009.  The Warball game

was shown at multiple toy fairs in 2008 and 2009.

Plaintiff, a toy company selling Warbles, marbles with laser-etched three-dimensional

figures inside them, was incorporated as a Pennsylvania LLC in December 2006. Plaintiff first showed products bearing the Warbles mark to the public at the 2008 Toy Fair trade show in February 2008 and alleges that it has since sold them through Pun's Toy Store in Bryn Mawr, Pennsylvania and the websites www.ewarbles.com and www.landofmarbles.com.

Plaintiff filed a trademark application, serial number 77326677, for its Warbles mark on November 11, 2007. On April 22, 2008, the application was published for opposition. On April 25, 2008, defendants filed a notice of opposition with the United States Trademark Trial and Appeal Board (TTAB) seeking to prevent registration of the Warbles mark. Plaintiff asserts that the TTAB opposition, filed on behalf of Bell from whom defendants have licensed the rights to the Warballs game, asserted that Bell had common law rights to the mark Warball which was confusingly similar to the Warbles mark and which predated plaintiff's trademark rights. On June 3, 2008, plaintiff filed a motion to dismiss defendants' complaint in opposition, alleging that it did not conform to the proper form for motions in opposition. Neither Bell nor defendants responded to plaintiff's motion to dismiss, an omission which defendants assert was "inadvertant," and, on July 11, 2008, the TTAB dismissed defendants' opposition with prejudice due to their failure to respond to plaintiff's motion to dismiss.

DISCUSSION

I must weigh four factors prior to disposing of a motion for a preliminary injunction: (1) whether the movant has demonstrated a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured if the request for relief is not granted; (3) whether granting the preliminary relief will result in even greater harm to the non-movant; and (4) the public interest. Getty Petroleum Mkg., Inc. v. Shipley Fuels Mkg, LLC, 293 Fed. Appx. 166,

167 (3d Cir. 2008), citing McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d

350, 356-57 (3d Cir. 2007).

Preliminary injunctive relief is "an extraordinary remedy" and "should be granted only in

limited circumstances."  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004),

citing Am, Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir.

1994), quotation marks omitted.  "[O]ne of the goals of the preliminary injunction analysis is to

maintain the status quo, defined as the last, peaceable, noncontested status of the parties."  Kos

Pharm, 369 F.3d at 708, citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187,

197 (3d Cir. 1990), citation and quotation marks omitted; see also 5 McCarthy on Trademarks

and Unfair Competition § 30:50 (4th ed. 2003) (McCarthy), noting that "[t]he status quo to be

preserved is not the situation of contested rights. . . .  In a trademark case, [it] is the situation

prior to the time the junior user began use of its contested mark: the last peaceable, non-contested

status."

I.      Likelihood of Success on the Merits

Plaintiff alleges that defendants engaged in unfair competition and trademark

infringement in violation of the Lanham Act[1] when it used the disputed mark.[2]  To prove

────────────────────

[1]  Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides:

(1) Any person who shall, without consent of the registrant-
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a
registered mark in connection with the sale, offering for sale, distribution, or advertising
of any goods or services on or in connection with which such use is likely to cause
confusion. . . shall be liable in a civil action by the registrant. . . .

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, provides:

(a)(1) Any person who, on or in connection with any goods or services . . . uses in

4

trademark infringement and unfair competition under the Lanham Act, plaintiff must prove that: (1) it owns the mark; (2) the mark is valid and legally protectable; and (3) defendants' use of the mark to identify goods or services is likely to create confusion.  Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 279 (3d Cir. 2001).  The parties dispute the likelihood of confusion factor.

Trademark law protects owners in the exclusive use of their marks when use by another is likely to cause confusion.  Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc., 186 F.3d 311, 315 (3d Cir. 1999), citing A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc. (A & H I), 166 F.3d 191, 205 (3d Cir. 1999).  To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark must show that defendants' use of a similar mark for its goods "causes a likelihood of confusion."  Kos Pharm, 369 F.3d at 709, citing A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., (A & H II), 237 F.3d 198, 210 (3d Cir. 2000).[3]

---

commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

[2]  Plaintiff also asserts claims for unfair competition and unfair and deceptive acts and practices which are derivative of plaintiff's claim for trademark infringement under federal law and are based on the same facts.  Urban Outfitters, Inc. v. BCBG Max Azria, 511 F. Supp.2d 482, 492 (E.D. Pa. 1997).  Thus, I need not consider these claims separately for the purpose of resolving plaintiff's motion for a preliminary injunction.

[3]  See 15 U.S.C. § 1114(1)(a), defining infringement as the unauthorized use of a "colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is

A likelihood of confusion exists when consumers viewing the defendants' trade dress would probably assume that the product it represents is associated with the manufacturer of a different product identified by the plaintiff's similar trade dress.  A & H II, 237 F.3d at 211.  The likelihood of confusion between two trade dresses is a question of fact.  McNeil Nutritionals, 511 F.3d at 357, citations omitted.

Plaintiff asserts that defendants' counterclaims admit the existence of a likelihood of confusion between the two trade dresses.[4]  However, Federal Rule of Civil Procedure 8(d)(2) states that "[a] party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."[5]  Courts have interpreted this to mean that "counterclaims may be asserted in an alternative or hypothetical manner and need not be consistent with the defenses and denials raised in the answer."  5 Wright & Miller, Federal Practice and Procedure § 1282 at 724 (3d ed. 2004), citing Charles Rubenstein, Inc. v. Columbia Pictures, Inc., 14 F.R.D 401 (Minn. 1953).[6]

---

likely to cause confusion, or to cause mistake, or to deceive"; 15 U.S.C. § 1125(a)(1), creating a cause of action for use "in connection with any goods . . . [of] any word, term [or] name . . . likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of [those] goods . . . by another person".

   [4]  Although I have granted defendants' motion to withdraw their counterclaims, I must consider whether the assertions made in the counterclaims are admissions because plaintiff contends that "even withdrawn or superseded pleadings are admissible [as evidence of factual allegations]."  Giannone v. U.S. Steel Corp., 238 F.2d 544, 547 (3d Cir. 1956).

   [5]  Although both parties refer to the rule as Rule 8(e)(2) in their memos on the subject, Rule 8 was revised in 2007 and the relevant rule is now codified as Rule 8(d)(2) and 8(d)(3).

   [6]  In Charles Rubenstein, the defendants were accused of involvement in a conspiracy.  14 F.R.D. at 401.  Their answer included a denial of the existence of the conspiracy and a counterclaim alleging that a conspiracy existed and the plaintiff was a co-conspirator that damaged the defendants in the conspiracy.  Id.  The District Court held this to be permissible

The Court of Appeals has interpreted this rule to mean that "a court 'may not construe [a plaintiff's] first claim as an admission against another alternative or inconsistent claim.'"  Indep. Enterp., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1175 (3d Cir. 1997), quoting Molbergen v. U.S., 757 F.2d 1016, 1019 (9th Cir. 1985).  The pleading rules developed in the Federal Rules of Civil Procedure were designed to "liberate pleaders from the inhibiting requirement of the law's insistence on technical consistency."  5 Wright & Miller, supra, § 1283 at 725.  To construe defendants' counterclaims as an admission of facts that were clearly denied in the answer would run counter to the purpose of the Federal Rules of Civil Procedure. Giannone, 238 F.2d at 547; see also Keebler Co. v. Rovira Biscuit Corp. 624 F.2d 366, 374 (1st Cir. 1980); Polaroid Corp. v. Polarad Elec. Corp. 287 F.2d 492, 496-97 (2d Cir. 1961).  This issue was addressed in the area of trademark law in Goodall-Sandford, Inc. v. Landers Corp., 187 F.2d 639 (C.C.P.A. 1951), in which the Court of Customs and Patent Appeals, the predecessor to the Court of Appeals for the Federal Circuit, allowed a defendant to both deny the likelihood of confusion in its answer and assert the likelihood of confusion in a counterclaim.  Id. at 642.  The allegations in the counterclaim were held to be alternative pleadings rather than factual admissions.  Id.

Defendants denied the likelihood of confusion in four responses in the answer. Defendants did not discuss likelihood of confusion in the factual allegations that began their counterclaims; they only allege a likelihood of confusion in the counts explaining the legal theories behind the counterclaims.  The allegations about likelihood of confusion contained in the counterclaims are reasonably inferred to be alternative pleadings, which are permissible under

pleading in the alternative.  Id.

7

Rule 8(d)(2).  See Goodall-Sandford, 187 F.2d at 642.  I find that the allegations presented in

defendants' counterclaims are not judicial admissions binding on defendants.  I will thus consider

the merits of the likelihood of confusion between the two products.

The Court of Appeals has adopted a non-exhaustive list of factors to consider in

evaluating likelihood of confusion, commonly referred to as the "Lapp factors."  Interpace Corp.

v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  These factors were developed for cases

involving non-competing products.  Id. at 462.  Although the Court has held that courts "'need

rarely look beyond the mark itself'" in cases involving competing goods, "consideration of the

Lapp factors . . . can be quite useful for determining likelihood of confusion even when the goods

compete directly."  A & H II, 237 F.3d at 212, quoting Lapp, 721 F.2d at 462.  Because some of

the initial Lapp factors were "not apposite for directly competing goods," the Court of Appeals

"adapted [them] to make them applicable whether the products directly compete or not."  Id. at

212-13.  As adapted, the Lapp factors are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendants' market, or expect that the prior owner is likely to expand into the defendants' market.

Id. at 215.[7]  "None of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."  Kos Pharm., 369 F.3d at 709, citing Checkpoint Sys., 269 F.3d at 280.  Each factor is weighed separately, which is not to say that all factors must be given equal weight.  Id., citations and quotation marks omitted.  "[T]he different factors may properly be accorded different weights depending on the particular factual setting.  A district court should utilize the factors that seem appropriate to a given situation."  Id., citing A & H II, 237 F.3d at 215.  The Lapp factors are best understood as "tools to guide a qualitative decision."  Id., citing A & H II, 237 F.3d at 216.

    1.       The Degree of Similarity of Mark and Trade Dress

---

[7]  The following are the Lapp factors adapted for the case of reverse confusion, i.e., where a commercially-strong junior user threatens the viability of a conceptually-strong senior user of a disputed mark:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;
(2) the strength of the two marks, weighing both a commercially strong junior user's mark and a conceptually strong senior user's mark in the senior user's favor;
(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
(4) the length of time the defendant has used the mark without evidence of actual confusion arising;
(5) the intent of the defendant in adopting the mark;
(6) the evidence of actual confusion;
(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
(8) the extent to which the targets of the parties' sales efforts are the same;
(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
(10) other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

A & H II, 237 F.3d at 234.  As the tests are largely similar, I will address the reverse confusion factors only when the relevant factors differ.

9

The Court of Appeals has held that "[t]he single most important factor in determining likelihood of confusion is trade dress similarity." McNeil Nutritionals, 511 F.3d at 359, citing A & H II, 237 F.3d at 216. "The proper test is not side-by-side comparison but whether the [trade dresses] create the same overall impression when viewed separately." Kos Pharm., 369 F.3d at 713, internal quotation marks and citation omitted. However, if buyers typically see the two products side-by-side, as would be true in this case if the products were someday both sold in toystores, then a side-by-side comparison may be appropriate. See A & H II, 237 F.3d at 216. As the products are not currently sold in the same stores, I will follow the test for products not currently sold side-by-side.

One way to compare these marks is to analyze them under the "sound, sight, and meaning trilogy." Bell Pub. Corp. v. Bantam Doubleday Dell Pub. Group, Inc., 1990 WL 55102, at *3 (E.D. Pa. Apr. 26, 1990), citing 2 McCarthy § 23:4 at 58 (2d ed. 1984); see also Restatement of Torts § 729(a). The products should be evaluated in their market context. Bell Pub. Corp., 1990 WL 55102, at *3, citing Restatement (Third) § 21 cmt. c. Trade dress protection embraces the total image of the product including such factors as the size, shape, and color of the product's packaging and appearance. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 765 n.1 (1992).

The sound of the two marks is very similar. Both marks have two syllables and begin "Warb." While plaintiff's mark is pronounced WAR-bles and defendants' mark is pronounced War-BALL, it is difficult to control the pronunciation of consumers in the marketplace or to easily catch the distinction. See Pocono Rubber Cloth Co. v. J.A. Livingston, Inc., 79 F.2d 446, 448 (3d Cir. 1935); Bell Pub. Corp., 1990 WL 55102, at *4. Thus, consumers attempting to

10

purchase a product involving a marble that they have heard of but have never seen or do not

know much about could easily be confused by these names.

However, the fact that names sound similar does not mean that they are likely to cause

confusion because the sounds of product names do not exist in a vacuum.  See e.g., Surfvivor

Media, Inc. v. Survivor Prod., 406 F.3d 625, 633 (9th Cir. 2005), holding that, while "Surfvivor"

and "Survivor" sound almost identical, the meanings and the trade dress operate to distinguish

them; Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830-31 (8th Cir. 1999), holding that "lean

cuisine" and "Lean 'N Tasty" for frozen entrees were not likely to cause confusion; Al-Site Corp.

v. VSI Intern, Inc., 174 F.3d 1308, 1330 (Fed. Cir. 1999), holding that "Magnivision" and

"Magna Dot" for eyeglass display racks are not likely to cause confusion because the

"Magna"/"Magni" prefix is frequently found in eye-related products; Streetwise Maps, Inc. v.

Vandam, Inc., 159 F.3d 739, 744-745 (2d Cir. 1998), holding that "Streetwise" and "Streetsmart"

maps are not likely to cause confusion; Nutri/System, Inc. v. Con-Stan Ind., Inc., 809 F.2d 601,

605-06 (9th Cir. 1987), holding that "Nutri/System" and "Nutri-Trim" for weight-loss services

are not likely to cause confusion; Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 968-69 (2d Cir.

1981), holding that "Bravos" for crackers and "Bravos" for tortilla chips are not likely to cause

confusion.  While the names of the products sound similar and both products involve large, clear

marbles with figures inside[8] and both marks involve the color blue and an orange-yellow color,

the trade dress of the two products and their marks are very different.

The trade dress and name of defendants' Warball product appears on the 6" x 9" x 2.5"

---

[8]  In plaintiff's product, the figure is laser-etched inside and in defendants' product, the
Savage Warball, the largest marble size within the game, contains a metal figurine embedded
inside.

box of defendants' product.  The trade dress evokes other war-based games, with Warball written

in Gothic lettering inside an oval emblem evoking stone or cracked earth and four precious

stones with lightning emanating from equally spaced around the oval emblem.  The product

name and mark is surrounded by figures preparing for battle and the phrase "Trading Card

Game" is beneath the mark.  The box also displays the marbles and trading cards through the

box's clear plastic windows.  The front of the box describes the game as a "Battle with

Warballs[TM] for World Supremacy Against Mutants & Powerful Forces."  The distinctive red and

white Duncan logo is displayed on the lower right hand side of the box.

The trade dress and name of plaintiff's 30-mm Warbles product[9] is displayed on a piece

of paper in a clear plastic rectangular tube approximately 3" long.  The trade dress is a medieval,

calligraphic-style W on a shield with the appearance of beams of light coming from behind it

with Warbles[TM] written in a child-appealing, blocky, bubble font.  When the Warble is removed

from the tube or the marble is rolled to the top of the tube, the multi-colored Noasha Toys logo is

visible on the back of the piece of paper inside the tube.

When consumers see the full trade dress of the two products, few would be confused so

as to believe that the two products were made by the same manufacturer.

The meaning of the two marks is less relevant.  The Oxford English dictionary defines

"warble" as "to modulate the voice in singing; to sing with trills and quavers."  2 The Compact

Edition of The Oxford English Dictionary 3683 (26th Edition 1987).  However, plaintiff claims

that its Warbles mark is based on the words "warrior" and "marbles," so this dictionary definition

---

[9] Defendants note that the prototype 40-mm marbles does not come with trade dress apart from a postcard which may be included with orders if available.  Accordingly, I will address the trade dress that comes in the packaging of the 30-mm marbles.

does not affect the meaning of the mark.  Additionally, Warball has no dictionary meaning as a

single word, but Warball can be broken into the two words "war" and "ball."  War is defined as

"hostile contention by means of armed forces, carried between nations, states, or rulers, or

between parties in the same nation or state."  Id. at 3682.  Ball is defined as "a globe or globular

body."  1 The Compact Edition of The Oxford English Dictionary 160 (26th Edition 1987).

Thus, neither the dictionary definitions of the marks nor the claimed meanings of the coined

marks provide guidance in weighing the meaning of the marks.

     While the sounds of the marks are nearly identical, the difference in the trade dresses of

the marks are substantial.  Thus, this factor leans slightly toward defendants.

     2.     Strength of the Owner's Mark

     In measuring the second Lapp factor, the strength of the owner's mark, a court must look

to (1) the inherent features of the mark contributing to its distinctiveness and conceptual strength;

and (2) the factual evidence of the mark's commercial strength or marketplace recognition of the

mark.  Urban Outfitters, Inc., 511 F. Supp.2d at 492, citing A & H II, 237 F.3d at 221.

     A.     Conceptual Strength

     In evaluating a mark's distinctiveness or conceptual strength,[10] A & H II, the Court of

Appeals noted that:

---

     [10]  As previously noted, in a reverse confusion case, the senior user has a commercially
weak mark when compared with the junior user's commercially strong mark.  The Court of
Appeals has held that, "as in direct confusion claims, a district court should weigh a conceptually
strong mark in the plaintiff's favor, particularly when the mark is of such a distinctive character
that, coupled with the relative similarity of the plaintiff's and defendant's marks, a consumer
viewing the plaintiff's product is likely to assume that such a mark would only have been
adopted by a single source - i.e., the defendant."  A & H II, 231-32.

In order to determine whether a mark is protectable as a trademark, marks are divided into four classifications:  (1) generic (such as "DIET CHOCOLATE FUDGE SODA"); (2) descriptive (such as "SECURITY CENTER"); (3) suggestive (such as "COPPERTONE"); and (4) arbitrary or fanciful (such as "KODAK").  Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they "bear no logical or suggestive relation to the actual characteristics of the goods." Suggestive marks require consumer "imagination, thought, or perception" to determine what the product is.  Descriptive terms "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods."  Generic marks are those that "function as the common descriptive name of a product class."  In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning.  Generic marks receive no protection; indeed, they are not "trademarks" at all. . . . [T]he classification system's primary purpose is to determine . . . whether consumers are likely to perceive the mark as a signifier of origin, rather than as a mere identification of the type of product.

A & H II, 237 F.3d at 221-22, internal citations omitted.

Plaintiff's mark is either suggestive, because it claims that it is a combination of warrior and marbles to create the word Warbles and could suggest an image of marbles in the mind, or arbitrary and fanciful, because it is a word that in no way describes a marble that has been laser etched with a figure.  Regardless, the mark is protected under the Lanham Act.

However, a finding that a mark is suggestive or arbitrary does not necessarily lead to a conclusion that it is conceptually strong.  "Suggestive or arbitrary marks may, in fact be 'weak' marks, particularly if they are used in connection with a number of different products."  A & H II, 237 F.3d at 222.  This is especially true where marks are applied to products and services in the same market.  Urban Outfitters, Inc., 511 F. Supp.2d at 493, citing Fisons Horticulture, Inc. v. Vigoro Industries, Inc., 30 F.3d 466, 479 (3d Cir. 1994).  Defendants produced evidence that the word "War" at the beginning of the products name is frequently used by a number of third parties in connection with games targeted at the same markets, including "Warmaster," "Warhammer," "Warlord" and "World of Warcraft."  This evidence offers some support for a finding that

14

consumers are less likely to associate a toy or game using the word "War" with a particular source, thus weakening the "Warbles" mark.  Though the two marks are remarkably similar in sound when the entire mark is considered, the Warbles mark is further weakened by the fact that there is another product that goes by the name Warbles, produced by Hog Wild, LLC, which is a package of half-sphere magnets in a clear plastic tube in a manner to make them appear like clear, embedded marbles.  The distinctiveness or conceptual strength aspect of this factor leans slightly toward defendants.

### B.     Commercial Strength

The Court of Appeals has held that "a consumer first encountering a mark with [a product] is likely to continue to associate the mark with [that product] and whether any subsequent confusion is 'direct' or 'reverse' will depend on whether the consumer's first experience was with the junior or the senior user of the mark."  A & H II, 237 F.3d at 230, citations omitted.  The greater the manufacturer's commercial disparity, the more likely it is that a consumer's first experience with a mark will be with one particular manufacturer; so if one manufacturer - whether junior or senior - expends large sums in advertising while the other does not, consumers will more likely encounter the heavily advertised mark first.  Id.  Where the greater advertising originates from the senior user, direct confusion is more likely; if the greater advertising originates from the junior user, reverse confusion is more likely.  Id., citations omitted.

Thus, in a direct confusion claim a plaintiff with a commercially strong mark is more likely to prevail than a plaintiff with a commercially weak mark.  Conversely, in a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a

15

plaintiff with a stronger mark, especially when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark.  Id.  Therefore, the Court of Appeals has found that in a reverse confusion claim, a court should analyze the "commercial strength" factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark.  Id. at 231, citing Fisons, 30 F.3d at 474, 479.

In this case, as the junior user, defendants have substantial commercial strength.  While the product is not yet available in stores, through their ability to place the Warball product in mainstream and specialty toy stores, they have shown a capacity for substantial commercial strength upon release of the product.  In addition, their advertisements in advance of release and planned to coincide with the launch would overwhelm any public awareness of plaintiff's product.  While the commercial strength and marketplace recognition of the Warbles mark is fairly weak because it has limited sales from only two sales locations and it presents no evidence of advertisements beyond its website and an appearance at the 2008 New York Toy Fair at which it took no orders, as this is a case of reverse confusion, the commercial strength aspect of this factor leans in favor of plaintiff.

Thus, in measuring the strength of the owner's mark factor, I find that the plaintiff's mark is conceptually weak to lean in favor of defendants and that defendants' relative commercial strength as compared to plaintiff leans in favor of plaintiff.  However, defendants' relative commercial strength as compared to plaintiff is not sufficient to overcome plaintiff's conceptually weak mark because the multiple uses of "War" for toys or games in this market lessens the likelihood that a consumer would associate such a toy with a particular source

16

regardless of defendants' commercial strength.  Thus, the strength of the owner's mark factor

leans slightly toward defendants.

> 3.       Prices of the Goods and Consumer's Degree of Care

The third Lapp factor focuses on "the price of the goods and other factors indicative of

the care and attention expected of consumers when making a purchase."  Lapp, 721 F.2d at 463.

The Court of Appeals has held that:

> [t]he following non-exhaustive considerations should guide a court's determination of the
> standard of ordinary care for a particular product.  Inexpensive goods require consumers
> to exercise less care in their selection than expensive ones.  The more important the use
> of a product, the more care that must be exercised in its selection.  In addition, the degree
> of caution used depends on the relevant buying class.  That is, some buyer classes, for
> example, professional buyers will be held to a higher standard of care than others.  Where
> the buyer class consists of both professional buyers and consumers, the standard of care
> to be exercised by the reasonably prudent purchaser will be equal to that of the least
> sophisticated consumer in the class.

McNeil Nutritionals, 511 F.3d at 363-64, quoting Versa Products Co., Inc. v. Bifold Co. (Mfg.)

Ltd., 50 F.3d 189, 204-05 (3d Cir. 1995).

The price points for the products are different.  Plaintiff's product, Warbles, sells in the

range of $7-10 per marble and the prices of defendants' Warball product range from

approximately $25 for the full Battle Box to approximately $13 for the Skirmish Packs.[11]  The

parties' price points are sufficiently different to permit consumers to distinguish them.

Here, the relevant classes are professional purchasers for toy-stores and speciality toy-

stores and consumer purchasers, primarily children and those giving Warbles or Warball to their

children as gifts.  Professional purchasers are unlikely, when seeing the products, whether in their

---

[11]  Warball Skirmish Packs are additions to the regular Warball game, purchased as a
Battle Box, that permits additional players and adds complexity to the game.  The trade dress of
the Skirmish Pack contains all the same elements as the Battle Box in smaller scale.

store, at a toy fair or in a catalog, to accidentally order a laser-etched marble when they wish to order a marble and trading card game.  Even if professional purchasers viewing the products in a list by name without trade dress or pictures may find them similar; professional purchasers are sophisticated and would likely note the difference in price point and product categories, i.e., collectible toy marble v. marble and trading card game.

Consumer purchasers vary in this context.  The target audience, children, knows and can describe what toys and games that it wants and will be able to differentiate between the Warbles marbles and the Warball game.  However, it is possible that someone purchasing one of the products for a child as a gift could mishear the request for one product and, seeing only one product available in a store, mistakenly purchase the other one.  Because these products are not yet widely known and the names do not indicate the type of product that the child wants, a reasonably-prudent purchaser would need to make further inquiries to determine the nature of the product.  A brief description of the product desired by the child, i.e., a marble and trading card game or a toy/collectible marble or just the price point of the product, would alleviate this sound-based confusion.  Thus, this factor leans slightly toward defendants.

> 4.    Defendants' Intent in Adopting the Mark

In evaluating defendants' intent, I examine not only whether defendants purposely chose their mark to cause confusion and capitalize on the senior user's good will but also the "adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion."  Kos Pharm., 369 F.3d at 721; but see A & H II, 237 F.3d at 225-26, holding that a "mere intent to copy, without more, is not sufficiently probative of a defendants' success in causing confusion to weight such a finding in the plaintiff's

favor; rather, defendants' intent will indicate a likelihood of confusion only if an intent to

confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble

the senior's."  Although evidence that defendants intentionally used a mark to cause confusion is

not a prerequisite to determining that defendants committed a Lanham Act violation, such

evidence weighs heavily in favor of finding a likelihood of confusion.  Urban Outfitters, Inc., 511

F. Supp.2d at 501, citing Checkpoint, 269 F.3d at 286.  Additionally, evidence of defendants'

carelessness in evaluating the potential confusion caused by its mark with that of a senior user is

"highly relevant" and will tend to favor a finding of likelihood of confusion.  Id.

There is no evidence that defendants intended their mark to cause confusion or to

overwhelm plaintiff's Warbles mark.  While defendants knew that they did not own the Warball

trademark as early as January 23, 2007, the mark had been used by Bell since 2002 and, while

defendants considered using other names at various points, they never did so.  Because the

Warball mark was adopted and used approximately five years before the Warbles mark was used

and as plaintiff presented no evidence that defendants chose to use the name Warball in order to

create confusion with or overwhelm its Warbles mark, this factor leans toward defendants.

5.    Evidence of Actual Confusion and Length of Time Without Actual Confusion

While "proof of actual confusion is not required for a successful trade dress infringement

action under the Lanham Act," Versa Products, 50 F.3d at 205, "evidence of actual confusion

may be highly probative of the likelihood of confusion."  Checkpoint Sys., 269 F.3d at 291.  The

district court has the ability and duty to weigh evidence of actual confusion in analyzing the sixth

Lapp factor.  See id. at 297; A & H II, 237 F.3d at 227.  Many courts of appeals have endorsed

the view that "[e]vidence of only a small number of instances of actual confusion can be

19

dismissed as inconsequential or de minimis." McNeil Nutritionals, 511 F.3d at 366, quoting 4

McCarthy § 23:14, collecting cases.  For example:

> Just as one tree does not constitute a forest, an isolated instance of confusion does not
> prove probable confusion.  To the contrary, the law has long demanded a showing that the
> allegedly infringing conduct carries with it a likelihood of confounding an appreciable
> number of reasonably prudent purchasers exercising ordinary care.

Id., quoting Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103

F.3d 196, 200-01 (1st Cir. 1996).  While it still "takes very little evidence to establish the

existence of the actual confusion factor," id., quoting AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531,

1544 (11th Cir. 1986), a district court may weigh the sixth Lapp factor in favor of a defendant

when it concludes that "the evidence of actual confusion was isolated and idiosyncratic."

McNeil Nutritionals, 511 F.3d at 366, citing A & H II, 237 F.3d at 227[12]; see also Checkpoint

Sys., 269 F.3d at 298; Ziebart Int'l Corp. v. After Mkt. Assocs., Inc., 802 F.2d 220, 228 (7th

Cir.1986), holding that "a 'single misdirected communication' would not show actual confusion

of the marks by the consuming public."

   While plaintiff has presented some evidence of actual confusion, that evidence was

insufficient to permit weighing this factor in its favor.  Plaintiff submitted the depositions of

----

[12]  In A & H II, in determining the likelihood of confusion between A & H's Miraclesuit and Victoria Secret's Miracle Bra Suit, the Court of Appeals found the that following evidence of alleged actual confusion was isolated and idiosyncratic: that finding that an article in Women's Wear Daily mentioning "the introduction of the Miracle Swimsuit in the upcoming Victoria's Secret Catalog," testimony that one of A & H's own public relations agents thought that A & H made both Miraclesuit and The Miracle Bra; that a buyer stated that she had heard of the Miraclesuit as a suit that enhanced the bust and that an A & H receptionist had received two inquiries concerning The Miracle Bra and an A & H sales agent's testimony that a professional swimwear buyer asked him if A & H carried The Miracle Bra swimsuit; that a professional swimwear representative asked if the two were related; that a former buyer asked if the Miraclesuit had that push-up element she had heard so much about and that a buyer asked him for an appointment to see The Miracle Bra line.  237 F.3d at 227.

Robert Eng and Jay Adan, vendors who develop online games for companies with collectable "real world" games such as Warbles, and accompanying emails in which they expressed confusion as to whether Warbles had been purchased by Duncan.  Eng wrote an email to Sasha Azar, co-owner of Noasha Toys, asking if he had heard of the "game called Warball" which is "tied to Duncan" and noting that he "saw their booth [at the GAMA Toy Show in April of 2008] and was wondering if your company had changed the spelling and logo."  Adan emailed Azar pictures of defendants' Warballs exhibit from the Toy Show.  In their depositions, both Eng and Adan claim to have experienced actual confusion between the two products.

However, these are isolated and idiosyncratic incidents of actual confusion from persons who, at the time of the emails, were attempting to contract with plaintiffs to produce an online game for Warbles.  See A & H II, 237 F.3d at 227.   Though they did not ultimately win the contract with Noasha, they are certainly interested parties with substantial experience in toys and their experiences at the GAMA Toy Show are thus dissimilar to the circumstances in which most consumers will encounter the two products.

"Ownership of a trademark does not guarantee total absence of confusion in the marketplace.  Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection."  A & H II, 237 F.3d at 226-27, citing Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir. 1978).  Thus, this factor weighs toward defendants.[13]

---

[13]  During the hearings, I reserved judgment on the issue of the admissibility of defendants' survey purporting to show that consumers were not confused by the two marks.  I see no need to rule on the admissibility of this evidence at this time because, without considering it, I have found that plaintiff has failed to show evidence of actual confusion.

6.      Channels of Trade and Advertising

With respect to the seventh Lapp factor, courts have recognized that "[t]he greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." Checkpoint, 269 F.3d at 288-89, internal quotation marks omitted.  In applying this factor, courts must conduct a fact intensive inquiry that examines, among other things, "the trade exhibitions, publications, and other media the parties use in marketing their products."  Id. at 289.  Even where there are "significant differences in trade channels," a district court may still conclude that these factors weigh in favor of a plaintiff because "perfect parallelism will rarely be found."  Urban Outfitters, Inc., 511 F. Supp.2d at 504, citing A & H II, 237 F.3d at 225.

Here, Warbles are marketed through only www.landofmarbles.com and Pun's Toy Store in Bryn Mawr, Pennsylvania.  Joseph Berardoni, owner of Pun's and a part owner of Noasha, testified that he did not sell mass marketed toys, like defendants' Warball, in his store. Defendants plan to market the Warball game in specialty toy stores focusing on comic books and related paraphernalia through its arrangement with Alliance, in addition to defendants' normal outlets in mass market toy stores.  However, as Warball is not intended to be sold in either Pun's or via the Land of Marbles website, they will not be marketed through the same channels.  This factor weighs toward defendants.

7.      Product Targets

When the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between two marks.  Urban Outfitters, Inc., 511 F. Supp.2d at 504, citing Checkpoint, 269 F.3d at 289.  Again, this is an "intensely factual" inquiry.  Id.  However, determining which party this factor favors depends on how broadly the court construes the targets

of the parties' sales efforts.  Id.

Here, the target audience of Warbles is children ages 6-10 and the target audience for Warball is children 8-12.  Thus, both parties seek to sell either marbles or a marble-related game to retail toy and game providers for children, so their markets overlap.  It is less clear whether they target the same group of young people.  The marketing of the products is very different, with Warbles being marketed as a "non-violent" product and Warball being marketed as a battle-based trading card and marble game.  However, because the targets are overlapping, this factor leans toward plaintiff.

       8.    Relationship of the Goods

In assessing the relationship of the goods at issue in the minds of consumers pursuant to the ninth Lapp factor, the question is "how similar, or closely related, the products are."  Kos Pharm., 369 F.3d at 723.  In this case, the relationship between the two products is similar:  both products feature large glass marbles with embedded figures, but one is in the context of a marble game and one is solely a marble.  The Court of Appeals has acknowledged that the relatedness of products factor may not favor a plaintiff if the goods "fall under the same general product category but operate in distinct niches."  Checkpoint, 269 F.3d at 288, holding that a finding that parties' products were unrelated even though both fell under the broader category of "corporate security" where the plaintiff focused on physical security and the defendants focused on information and computer security was not clear error.  However, that is not the case here.  "The question is whether the consumer might . . . reasonably conclude that one company would offer both of these related products."  Fisons, 30 F.3d at 481.  Both parties manufacture, distribute and sell marbles, one within the context of a game and one on its own, which makes it reasonable for a consumer to

23

conclude that one company would offer both products and increases the potential for consumer confusion between the marks.  Courts have concluded that products are related even when they have far less identity of function than is found here.  Id. at 481, citing cases where the following relationships between goods was close enough to lean toward a likelihood of confusion:  women's scarves and apparel with women's cosmetics and fragrances; liquor with restaurant selling liquor; batteries and lamps with light bulbs and lamps; pipe tobacco and bar accessories with scotch whiskey.  Thus, this factor weighs in favor of plaintiff.

>    9.    Other Facts Suggesting the Public Might Expect the Prior Owner to Manufacture
>          Both Products

In a case of reverse confusion, this tenth Lapp factor requires an examination of other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market. A & H II, 237 F.3d 198, 234, citing Fisons, 30 F.3d at 480, requiring courts to examine facts suggesting that the public might think that the junior user would expand into the senior user's market.  The public might well assume that defendants would manufacture the Warbles product as an extension of the Warball game.  While defendants emphasize that they do not at this time sell their Savage Warballs with the embedded figure as a separate collectable apart from the Warball game as they cannot be used without the trading cards to play the game and have no plans to do so in the future, consumers could believe that they had chosen to do so.[14]  This factor leans slightly toward plaintiff.

_____

[14]  However, I note that the figures within the marbles are displayed differently as those within a Warble are laser-etched and those within a Savage Warball are metal figurines.

10.    Weighing the Lapp Factors

Only the final three of the ten <u>Lapp</u> factors, <u>i.e.</u>, those of the products' targets, the relationship between the products and the other factors suggesting that the public might expect defendant to produce both products, lean toward plaintiff, though nearly all of the factors are close.  On balance, the <u>Lapp</u> factors weigh against granting a preliminary injunction because plaintiff has not sufficiently demonstrated a likelihood of success on the merits.

II.    Irreparable Injury

The Court of Appeals has held that "the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm."  <u>Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.</u>, 562 F.3d 553, 557 (3d Cir. 2009), <u>citing</u> <u>Adams v. Freedom Forge Corp.</u>, 204 F.3d 475, 487 (3d Cir. 2000).  Additionally, "[b]efore granting a preliminary injunction, a district court must consider the extent to which the moving party will suffer irreparable harm without injunctive relief."  <u>Liberty</u>, 562 F.3d at 557, <u>citing</u> <u>Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.</u>, 290 F.3d 578, 595 (3d Cir. 2002).  However, an injury measured in solely monetary terms cannot constitute irreparable harm.  <u>Liberty,</u> 562 F.3d at 557, <u>citing</u> <u>Bennington Foods LLC v. St. Croix Renaissance, Group, LLP.</u>, 528 F.3d 176, 179 (3d Cir. 2008).

Plaintiff argues that defendants' plan to begin a large, national rollout of the Warball products immediately could overwhelm the Warbles product in the market which would damage and overwhelm plaintiff's goodwill.  Defendants contend that plaintiff can show no irreparable harm if the parties proceed to trial in a timely manner because plaintiff's product has few sales with little or no logo branding on the products sold via the website in the United States.  While

plaintiff asserts that addition features are being developed, I need not address them because they have not affected Warbles' goodwill.

As plaintiff has failed to show a likelihood of confusion and because the products have is no market overlap and there is no imminent prospect of any market overlap even as plaintiff continues to develop its product, I find that plaintiff has not shown that it specifically and personally risks irreparable harm to its goodwill if I do not grant this preliminary injunction. Thus, any harm is monetary in nature and can be addressed at the end of trial, if appropriate. This factor leans against granting plaintiff's motion for a preliminary injunction.

III.     Relative Harm

The third factor in an analysis of whether injunctive relief is appropriate assures that "the issuance of an injunction would not harm the infringer more than the mark's owner." Opticians, 920 F.2d at 197. In contrast with plaintiff's concern about its commercially-weaker senior mark being overwhelmed in the market by defendants' commercially-stronger junior mark, defendants have shown the potential for substantial harm if this preliminary injunction is granted. Defendants have planned and advertised for a summer 2009 product launch and it would be costly to re-advertise and launch substantially later[15] should they prevail at the jury trial,[16] in addition to the lost sales that may result. However, defendants planned this rollout in full knowledge of plaintiff's claim for trademark infringement. While this harm is at least in part self-inflicted,

---

[15]  While defendants have rescheduled the launch date several times, it was because of delays in production. The product is now ready to launch pending resolution of the trademark issue.

[16]  However, defendants may also suffer a substantial cost if they launch the Warball product after resolution of plaintiff's motion for a preliminary injunction and before trial if the jury finds that defendants' have, in fact, infringed upon plaintiff's mark.

defendants have demonstrated a potential for greater harm if I were to grant the preliminary

injunction than plaintiff has demonstrated if I were not to grant it.  This factor leans against

granting plaintiff's motion for a preliminary injunction.

IV.    Public Interest

      In a trademark case, the public interest is "most often a synonym for the right of the public

not to be deceived or confused."  Opticians, 920 F.2d at 198, citations omitted.  Having found that

plaintiff has not demonstrated a likelihood of confusion, the public interest would not be damaged

by not granting a preliminary injunction in this case, especially as a trial can be scheduled

reasonably promptly to minimize the public's exposure to the Warball mark should a jury find that

defendants have infringed on plaintiff's Warbles mark at trial.  This factor leans against granting

plaintiff's motion for a preliminary injunction.

V.    Conclusion

      Based on the foregoing analysis, as I find that plaintiff has failed to demonstrate a

likelihood of success on the merits based on the likelihood of confusion, that plaintiff has not

demonstrated that it will be irreparably harmed if I do not grant its motion for a preliminary

injunction, that defendants have demonstrated that they would suffer a greater relative harm if I

granted the preliminary injunction and that the public interest would not be harmed, and

considering that a preliminary injunction is an extraordinary remedy, I will deny plaintiff's motion

for a preliminary injunction.

      An appropriate Order follows.